## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## NEW ALBANY DIVISION

SOUTHERNCARE, INC.,             )
                                    )
          Plaintiff,           )
                                    )
          v.                 )     No. 4:25-cv-00150-TWP-KMB
                                    )
BRISTOL HOSPICE - INDIANA, LLC d/b/a  )
BRISTOL HOSPICE - NEW ALBANY,     )
MADISON HOLLABAUGH,         )
                                    )
          Defendants.      )

## ORDER GRANTING RENEWED MOTION FOR PRELIMINARY INJUNCTION

This matter is before the Court on Plaintiff SouthernCare, Inc.'s ("SouthernCare"), Renewed Motion for Preliminary Injunction (Filing No. 55), against its former employee, Defendant Madison Hollabaugh ("Hollabaugh"), and her new employer, Defendant Bristol Hospice - Indiana, LLC d/b/a Bristol Hospice - New Albany ("Bristol"). SouthernCare seeks injunctive relief to prevent alleged violations of Hollabaugh's restrictive covenants. For the following reasons, SouthernCare's Renewed Motion is **granted**.

## I.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). To obtain a preliminary injunction, the party seeking the injunctive relief must demonstrate that:

> (1) it has some likelihood of success on the merits of its claim; (2) it has no adequate remedy at law; (3) without relief it will suffer irreparable harm. If the plaintiff fails to meet any of these threshold requirements, the court must deny the injunction. However, if the plaintiff passes that threshold, the court must weigh the harm that

the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest.

*GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (citations and quotation marks omitted). "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Stuller, Inc. v. Steak N Shake Enters.*, Inc., 695 F.3d 676, 678 (7th Cir. 2012) (citations and internal quotation marks omitted). "Stated another way, the district court 'sit[s] as would a chancellor in equity' and weighs all the factors, 'seeking at all times to minimize the costs of being mistaken.'" *Id.* (quoting *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

## II.    FINDINGS OF FACT[1]

### A.    Hollabaugh's Employment at SouthernCare

SouthernCare and Bristol are direct competitors in the hospice service industry. SouthernCare operates eight branches in Indiana, including one in New Albany ([Filing No. 1](#) ¶¶ 1–2). The market for hospice services is highly competitive in the New Albany area. *Id.* ¶ 4. SouthernCare's success depends on the relationships its employees build with local patient referral sources, including doctors, hospitals, and other care facilities in southern Indiana. *Id.* ¶ 5.

Hollabaugh began working for SouthernCare in 2021. *Id.* ¶ 6. In 2022, Hollabaugh became a Hospice Care Consultants, and in that role, she developed and maintained relationships with referral sources and advertised SouthernCare's services. *Id.* ¶¶ 6–7. Her territory during her last

---

[1] Any finding of fact should be deemed a conclusion of law to the extent necessary.

two years of employment as a Hospice Care Consultant with SouthernCare included Floyd, Clark, Harrison, and Scott counties, as well as some accounts in Louisville, Kentucky (Filing No. 26-1 ¶ 19; Filing No. 55-16 at 28:15–23). As a Hospice Care Consultant, Hollabaugh was responsible for promoting SouthernCare and developing relationships with referral sources (Filing No. 55-50 at 109:4–21). Her job, at least in part, also entailed obtaining and updating contracts with referral sources for General In-Patient Services, respite stays, and hospice care, and "one-time" contracts for specific patient referrals. *Id.* at 109:4–110:22; (Filing No. 55-16 ¶¶ 5–7; Filing No. 55-18 ¶ 6).

While working for SouthernCare, Hollabaugh was allowed access to SouthernCare's "community presentations, continuing education, Protected Health Information, patient information and records . . . , marketing materials, sales and marketing training, strategies, and other resources." (Filing No. 1 ¶ 15). Hollabaugh also had access to SouthernCare's "End of Day" reports, which contain patient names and statuses, referral dates and sources, admission information, leads, budgets, and other information (Filing No. 26-1 ¶ 45; Filing No. 1 ¶¶ 9, 16).

## B.    Hollabaugh's Employment Agreement

When Hollabaugh became a Hospice Care Consultant, she signed a Noncompetition, Nonsolicitation, and Confidentiality Agreement (the "Employment Agreement"). The Employment Agreement contains several restrictive covenants including confidentiality, noncompetition, customer nonsolicitation, and employee nonsolicitation provisions.

The Confidentiality Provision prohibits Hollabaugh from "possess[ing], us[ing], or disclos[ing]" any of SouthernCare's confidential information without SouthernCare's consent.

The Noncompetition Provision provides that for six months after her separation from SouthernCare and within seventy-five miles of SouthernCare's New Albany office, Hollabaugh may not "own more than 5%, operate, be employed by or perform any work for hire that is the

same or same or similar to the work performed for [SouthernCare] during the [two-year period before Hollabaugh's separation], for a Competitive Business." (Filing No. 55-15 at 5–6).

The Customer Nonsolicitation Provision and Employee Nonsolicitation Provision both apply for eighteen months after Hollabaugh's separation from SouthernCare. The Customer Nonsolicitation Provision prohibits Hollabaugh from: (1) inducing or attempting to induce a "Covered Party" to cease or decrease its business with SouthernCare; (2) contacting, soliciting, or communicating with a Covered Party for the purpose of encouraging, causing, or inducing the Party to cease, reduce, or modify its business with the SouthernCare, or to divert hospice patients to a competitor; or (3) interfering with SouthernCare's business relationships with a Covered Party. "Covered Party" includes anyone with "whom [Hollabaugh] had material business-related contact" and "who orders, refers, recommends, or arranges for the provision of hospice services from or with [SouthernCare]" during the two years before Hollabaugh's resignation. *Id.* at 6.

The Employee Nonsolicitation Provision provides that Hollabaugh will not (A) hire, employ, or solicit to hire or employ any SouthernCare employee with whom Hollabaugh worked during her last two years at SouthernCare: (B) solicit any such employee to leave his or her employment at SouthernCare; or (C) solicit any such employee to violate an employment agreement or other restrictive covenant or agreement with SouthernCare. *Id.*

C.  **Hollabaugh's Offer from Bristol and Resignation from SouthernCare**

In or around late 2024, Hollabaugh began looking for other job opportunities (Filing No. 26-1 ¶¶ 26–32). In April 2025, she was contacted by Bristol's Division President, Susie de la Rosa ("de la Rosa"), on LinkedIn about Bristol opening a new office in New Albany (Filing No. 55-2 at 4). In messages on LinkedIn, Hollabaugh and de la Rosa discussed Hollabaugh being hired as either an Executive Director or a Director of Marketing of the New Albany office. *Id.* at 7. Hollabaugh discussed the two roles with her husband, stating that she would not "ever want to be

the executive Director because that is all clinical like staffing and the actual patients" but "would definitely be interested in the director of marketing and business development." *Id.* at 8. The next day, Hollabaugh texted a friend expressing her excitement about the opportunity but expressing concern about her Employment Agreement with SouthernCare; Hollabaugh stated that she "ha[s] a really strict noncompete so it would be a really big problem [Bristol] would have to buy [her] out of it." (Filing No. 55-3 at 6).

In mid-May 2025, Hollabaugh told de la Rosa that she would send a copy of her Employment Agreement for Bristol's counsel to "take a look" (Filing No. 55-4 at 2). Hollabaugh could not find her Employment Agreement, so she sent de la Rosa "a link from Google that [she] found from like ChatGPT or Google." (Filing No. 57-11 at 109:3–8). Hollabaugh also told de la Rosa that she would recommend "a couple of people that [she thought] would definitely be interested in the executive Director role." (Filing No. 55-4 at 2).

By June 3, 2025, Bristol had obtained approval to make Hollabaugh an oral job offer and expected to make a written offer soon (Filing No. 55-5 at 3, 6–9; Filing No. 55-7 at 4). In texts from that day, Hollabaugh asked de la Rosa whether "it [would] be possible to title [her position] director of business development/sales," to which de la Rosa responded "Absolutely! The plan is to have you as the Director of Marketing for that area." (Filing No. 55-6 at 2–3). However, Hollabaugh was not hired as a Director of Marketing. Her title was changed to Executive Director in an attempt to comply with her Employment Agreement (Filing No. 57-11 at 125:19–126:3).

The role of Executive Director is an internal, administrative role. Hollabaugh's responsibilities in that role include overseeing daily operations, ensuring patient care, hiring staff, and obtaining contracts needed for Bristol to apply for a hospice license in Indiana (Filing No. 57 at 13). As part of her work obtaining licensure contracts, Hollabaugh visited facilities that are also

SouthernCare referral sources: These visits were not intended to be solicitations, Hollabaugh did not bring promotional materials for these visits, and she did not give any presentations promoting Bristol's services. Bristol received the necessary contracts and obtained its Indiana hospice license on August 5, 2025 (Filing No. 26 at 4).

Hollabaugh's messages with friends and family after accepting the Executive Director role show that she believed that a marketing role at Bristol would interfere with her Employment Agreement. In a text message to her sister-in-law on June 4, 2025—while still expecting that she would be hired as Director of Marketing—Hollabaugh told a friend that Bristol would need "to buy [her] out of [her] noncompete." (Filing No. 55-7 at 6). She stated, "[i]t's literally going to be a huge issue at my company. I'm opening up an office probably 3 miles down the road so I don't know if maybe the lawyers are pushing back or something now and they have to make my title something else to get away with it." *Id.* The next day, June 5, 2025, Hollabaugh texted friends about her offer from Bristol and the need to change her title in light of her Employment Agreement:

> There is a hospice company out in the west and in Texas and they have asked me to open up the first Midwest branch here so I will be the executive director of clinical operations and then once I hire staff, I will actually move into the area director of business development role, but with my noncompete, I have to be a little bit strategic about my title with them. So that is how we are doing it!

(Filing No. 55-8 at 3).

On June 6, 2025, Hollabaugh received a written offer to serve as Executive Director of Bristol's New Albany office, and she accepted the offer on June 9, 2025 (Filing No. 55-24). However, Hollabaugh expressly considered marketing to be part of her duties. On June 19, 2025, Hollabaugh was texting a friend about her new job. Hollabaugh's friend jokingly suggested that Hollabaugh hire her "as [her] social media gal" for "Marketing" and to "Get more customers" and "Clients." (Filing No. 55-25 at 2–4). Hollabaugh responded "I don't think you understand the business . . . . That's my job." *Id.* at 4.

6

Hollabaugh continued expressing her concern that her work for Bristol would violate her Employment Agreement, even after accepting the job of Executive Director. On June 10, 2025, Hollabaugh texted her sister-in-law that she was "nerv[ous]" about moving to Bristol, "but [Bristol's] lawyers looked over it and will buy me out of my non compete." (Filing No. 55-9 at 3). A few days later, on June 13, 2025, Hollabaugh texted a friend that she couldn't "let [SouthernCare] find out before the last Friday of this month . . . . [I]t is a big big secret because I have a big noncompete that this is directly going against." (Filing No. 55-10 at 16–17). On the last Friday of June, Hollabaugh was scheduled to get her May commission payment, and she did not want SouthernCare to interfere with her commission payment or her offer from Bristol before then (Filing No. 55-11 at 124:17–25, 158:12–20).

Hollabaugh also expressed concern that this lawsuit is very similar to another noncompetition lawsuit filed by Gentiva against Bristol in the District of Maine. In that analogous lawsuit, the district court found that a "fact finder would likely conclude at trial that [the defendant] breached the noncompetition covenant by promptly going to work for Bristol," but denied Gentiva's motion for a preliminary injunction due to a lack of evidence of irreparable harm. *Curo Health Service LLC v. Lilly*, No. 24-cv-417, 2024 WL 5247689, at *4 (D. Me. Dec. 30, 2024). On June 17, 2025, Hollabaugh texted her sister-in-law a link to an article about the Maine lawsuit, stating "[t]his is literally my company currently suing the company. I am going to end December [*sic*] for essentially the exact thing I am going in a DeNovo startup." (Filing No. 55-32 at 4). Hollabaugh texted another friend on July 29, 2025—after learning that SouthernCare intended to file this lawsuit—that Bristol was "in the middle of another big lawsuit with [her] old company and [her] current company like somebody else just did the same thing back in September." (Filing No. 55-33 at7). However, Hollabaugh reassured herself that "Gentiva lost this case a couple of

months ago . . . . [s]o hopefully they did not learn what to say differently and w[in] the case with me." *Id.* at 5.

On June 27, 2025, Hollabaugh forwarded an "End of Day" report from her SouthernCare email to her personal email (Filing No. 55-40). She also emailed her resignation letter to SouthernCare (Filing No. 55-34). Hollabaugh's letter stated that her resignation would be effective two weeks later (July 11, 2025) but her resignation was accepted effective June 30, 2025 (Filing No. 55-18 ¶ 10). During a June 30, 2025 exit meeting, Hollabaugh declined to disclose where she planned to work next, and she was reminded of her Employment Agreement with SouthernCare. *Id.* at ¶¶ 10–11; (Filing No. 55-28 at 7–8).

### D.   Communications With/About New Bristol Employees

Hollabaugh began having discussions about hiring Bristol staff as early as June 10, 2025, well before her last day with SouthernCare. That day, Hollabaugh asked her sister-in-law to "let [her] know" if "any nurses [were] looking for a killer job." (Filing No. 55-9 at 2). Her sister-in-law identified one nurse who was interested in leaving her current job; Hollabaugh offered some information about future positions at Bristol but said, "I would not work at SouthernCare. This [sic] are going downhill there as well . . . . . I would tell her definitely not to work for Gentiva or SouthernCare." *Id.* at 4–5.

That same day, Hollabaugh began seeking out a medical director for Bristol's new office. She texted an acquaintance to ask if a doctor ("Dr. Harper") was still working with Care First, whether he was previously Care First's medical director, and whether he "would ever be interested in that again." (Filing No. 55-29 at 2). Hollabaugh told the acquaintance, "[i]t's not for SouthernCare... just between us." *Id.* at 3. Hollabaugh stated she would "put a bug in [Dr. Harper's] ear," but it is unclear whether Hollabaugh later contacted Dr. Harper. Two days later, Hollabaugh contacted a different doctor, Dan Eichenberger, about serving as the medical director of Bristol's

new office, although he stated he was not interested (Filing No. 55-30 at 2). On July 3, 2025, Hollabaugh texted a nurse practitioner at referral source Optum about Dr. John Crase ("Dr. Crase"), who is a physician at Optum but also under contract as a Medical Director for SouthernCare. Hollabaugh told the nurse practitioner that she was "trying to figure out how" to tell Dr. Crase about Bristol's new office because she "really want[ed] him to come with [her]." (Filing No. 55-45 at 3). Hollabaugh stated that she "could get in a lot of trouble for trying to take him with [her], but he could come willingly." *Id.*

Hollabaugh also spoke with SouthernCare employees Summer Russell ("Russell"), Brandy Trader ("Trader"), and Aly Rayner ("Rayner") about moving to Bristol. On June 14, 2025, Hollabaugh texted Russell to ask if she would be interested in a new job opportunity, "secretly." (Filing No. 55-37). Hollabaugh added that she "really wanted to talk to [Russell] in a couple of weeks" but "just can't yet." *Id.* at 3–4. Hollabaugh texted Russell a couple of weeks later to let Russell know that she had resigned and to ask Russell, "[a]re you looking for a job." (Filing No. 55-36 at 2, 4). According to Hollabaugh, her and Russell are good friends, and she could have had a discussion with Russell about joining Bristol after this text conversation, although she does not recall whether they did (Filing No. 55-11 at 87:13–88:2).

Trader worked for both SouthernCare and referral source Optum. Hollabaugh texted Trader on June 28, 2025, that she had submitted her resignation to SouthernCare but "[h]opefully [they] will see each other more." (Filing No. 55-35 at 2). Hollabaugh considers Trader to be a good friend, and after Hollabaugh resigned from SouthernCare, she had at least one discussion with Trader about moving to Bristol (Filing No. 57-11 at 90:7–92:1, 93:10–12). At the time of this discussion, Hollabaugh knew that Trader had been trying to resign from SouthernCare, but Hollabaugh did not know whether Trader was still employed by SouthernCare. *Id.* at 92:4–12. Hollabaugh admits

she also may have communicated with her direct manager, Rachel Worrath ("Worrath"), about hiring Trader. *Id.* 94:5–9. According to Hollabaugh, no decision was made on whether to extend a job offer to Trader because Hollabaugh was "too busy" and "it's not a priority." *Id.* at 94:10–15.

Hollabaugh's hiring discussions with Rayner progressed significantly further. She and Rayner were friends, and Hollabaugh had previously obtained a copy of Rayner's résumé (Filing No. 57-11 at 59:17–25). Hollabaugh discussed potential employment opportunities at Bristol with Rayner. *Id.* at 14:1–7, 58:16–20. On July 28, 2025, Hollabaugh texted Rayner's name and contact information to Blake Hawkins ("Hawkins"), Bristol's Vice President of Business Development (Filing No. 55-68 at 2). Hollabaugh told Hawkins, "[t]his is a good friend of mine who I've talked with about a possibility liason [*sic*] sole. She's a great RN admissions now from the Gentiva/southerncare new Albany branch. Thought I'd go ahead and share her contact info if you want it." *Id.* Hawkins reached out to Rayner a few days later; on July 31, 2025, Hollabaugh texted Hawkins, "Aly [Rayner] said you reached out to her yay!" (Filing No. 55-69 at 2). Hollabaugh also offered to Hawkins, "Fyi she did just take a liason [*sic*] role at SoCare/Gentiva. They didn't bump her salary though. Shes at [redacted]K with bo bonus's [*sic*] just so you know where she's at. . . . She has really well established relationships in probably two dozen accounts." *Id.* Hawkins does not live or work in Indiana or Kentucky. Hollabaugh thinks it is "a possibility" that Hawkins would have known about Rayner through his own independent research (Filing No. 57-11 at 60:14–17), but there is no evidence that Hawkins identified Rayner through any means other than Hollabaugh.

The next day, August 1, 2025, Hollabaugh emailed several Bristol executives, including Hawkins, Worrath, and de la Rosa, with the subject line "Marketer/liason [*sic*]," attaching Rayner's resume, and stating:

> I figured I would share this before our 4 o'clock call today. Thisis [*sic*] Aly Rayner's résumé. I know Blake has already reached out to her, but I wanted to send so the

rest of you have it. I would love to bring her on as our liaison. She has dozens and dozens of wonderful relationships with all the southern Indiana accounts.

(Filing No. 55-70 at 2). Ultimately, Bristol offered Rayner a job, and Rayner accepted (Filing No. 57-11 at 65:12–14). However, Rayner later withdrew her acceptance partially because of this lawsuit. *Id.* at 65:24–66:22.

In addition to Russell, Trader, and Rayner, Hollabaugh was involved to some extent in the hiring process for a SouthernCare social worker. In an August 12, 2025 text message to de la Rosa, Hollabaugh stated, "[t]here is an mSW [Social Worker] from SouthernCare that Stephanie [from Bristol] is going to reach out to but I think it's probably best to wait until after the hearing today," meaning the hearing on SouthernCare's motion for TRO (Filing No. 55-71 at 3–4). The same day, Hollabaugh's manager, Worrath, texted her asking, "[d]o you have a [Social Worker] that we should reach out to on your behalf?" (Filing No. 55-72 at 4).

### E.    Communications With Referral Sources

Both before and after her resignation from SouthernCare, Hollabaugh contacted several SouthernCare referral sources about her departure from SouthernCare and new position at Bristol. On June 13, 2025, Hollabaugh told Evan Gold, the Operating Director at Cornerstone Caregiving in Louisville ("Cornerstone"), that she was planning to leave SouthernCare and join Bristol (Filing No. 55-38 at 2). Hollabaugh asked Gold to keep her plans a secret, which Gold did. *Id.* at 2–3.

On June 17, 2025, Hollabaugh told a contact at Pam Rehab about her move and said, "Exited to share more soon with you. . . . I'd like to partner with you guys even more and really try to help." (Filing No. 55-31 at 4–7). Hollabaugh also sent the Pam Rehab contact an image showing all of Bristol's office locations. *Id.* at 5–7.

On June 28 and 30, 2025, Hollabaugh told several more referral sources that she was leaving SouthernCare, including contacts at Total Care, Optum, the Louisville VA Hospital,

Harrison Springs, and Pam Rehab (Filing No. 55-35; Filing No. 55-43 at 2). In these messages, Hollabaugh told her contacts that she would share what she was doing and speak to them in person or on the phone "soon" (Filing No. 55-35 at 2; Filing No. 55-43 at 2, 4, 8, 11–13, 15–16, 18–22, 24–26). Hollabaugh also told one contact that they would be "see[ing] each other more" (Filing No. 55-35 at 3) and told another contact that she would "still be coming to PAM [Rehab] w[ith the] new job," (Filing No. 55-43 at 28).

On July 3, 2025, one week before her first day at Bristol, Hollabaugh texted a nurse practitioner at Total Care about her role at Bristol's new office in New Albany (Filing No. 55-44 at 3). Hollabaugh also asked that nurse practitioner if Total Care was "like fully contracted with SouthernCare," *id.* at 4, and that Bristol is "getting up and running on Monday with all of the licensing, etc," *id.* at 5.

Hollabaugh texted at least eight other referral sources in early July that Bristol's New Albany office would be open soon (Filing No. 55-45; Filing No. 55-46). Hollabaugh also made comments to several of these referral sources about working with them in the future (Filing No. 55-46 at 2–3 (VA Hospital: "I am so grateful for you and giving me a chance after poor prior experiences with So[uthern] Care! . . . Should be taking patients August 1 or so"); *id.* at 9 ("You guys will not be disappointed."); *id.* at 11 ("Excited to continue to work with you guys and share more info here shortly.")).

On her second day with Bristol, July 11, 2025, Hollabaugh texted with referral sources about Bristol obtaining a National Provider Identifier ("NPI") number and opening in the near future. A contact from Pam Rehab asked Hollabaugh, "[w]hen can you start taking patients," and Hollabaugh responded, "I hope in just a couple of weeks very shortly . . . . So excited to tell you all about it! . . . . We have an NPI #." (Filing No. 55-25 at 2–3).

Hollabaugh had a longer discussion with case managers at the Louisville VA Hospital about Bristol. On July 11, 2025, Hollabaugh texted one of the case managers, Amanda Logsdon ("Logsdon"), "We have an NPI #!!!" (Filing No. 55-51 at 2). Logsdon asked, "[i]f [your NPI number is] active when can you start taking veterans," and Hollabaugh responded, "I hope VERY soon . . . . As in a few weeks." *Id.* at 4–5. Hollabaugh also asked Logsdon to check whether Bristol's NPI number was active, and Logsdon informed her it was not. *Id.* at 6. The following Monday, July 14, 2025, Hollabaugh texted Logsdon and another case manager, Toni Chaudron ("Chaudron"): "Wanted to send you guys a little bit of info this morning on some of [Bristol's] specialty programs. I'm sure we will be talking more soon but wanted to start sharing some info with you. [Bristol is] part of the we honor our veterans program." (Filing No. 55-53 at 2). Hollabaugh also sent the case managers a link to a website with information on Bristol's program. *Id.* at 2–3. Hollabaugh then again asked the case managers to recheck whether Bristol's NPI number was active in their systems, but it was not. *Id.* at 5–6. Following her conversations with the case managers, Hollabaugh emailed de la Rosa: "The Louisville VA hospital case managers ran our NPI number and it does not look like we are a contracted vendor currently. I just wanted to tell you this as early as possible so that we can see what we need to do for that. *They are a very big referral source to me and will likely provide anywhere from 5 to 10 admissions per month starting out.*" (Filing No. 55-54 at 2 (emphasis added)).

Hollabaugh also emailed a contact at Baptist Health Floyd, one of SouthernCare's largest referral sources, on July 14, 2025:

> I wanted to reach out to you as my first point of contact to let you know that I have opened Bristol Hospice New Albany. I am so excited to share more with you and your entire team soon. I would love to be able to serve your patients in the inpatient setting when GIP needs arise. What is the best way for me to work on hopefully getting a contract with the hospital? I have our NPI number and anything else that you guys may need.

(Filing No. 55-63 at 8). Hollabaugh and her contact at Baptist Health Floyd emailed each other over the next few days about securing a contract between Bristol and Baptist Health Floyd. *Id.* at 5–8. Ultimately, on July 30, 2025, the contact told Hollabaugh that Baptist Health Floyd was "holding off on signing any contracts until further notice," but Hollabaugh asked the contact to still "add [Bristol] to the Hospice options list of patients who are being discharged." *Id.* at 2. Bristol would not need a contract with Baptist Health Floyd to provide general in-patient services to patients who are being discharged from Baptist Health Floyd (Filing No. 57-11 at 151:21–152:12).

On July 15, 2025, Hollabaugh texted a contact at Autum Woods Health Campus that she had "opened Bristol Hospice New Albany," "would love to email [her] some info," "would love to partner with [her] for all respite stays and being an option for a hospice provider for [her] residents," and would "email [her] some info." (Filing No. 55-56 at 2–3). Hollabaugh also asked whether Trilogy Health Services, Autumn Woods' parent company, "do[es] blanket company contracts or campus to [c]ampus." *Id.* at 3. Hollabaugh also emailed a contact at Harrison Springs, another Trilogy subsidiary, with a contract, stating "I look forward to sending you respite stays soon. I appreciate you and Trilogy allowing us to care for your residents." (Filing No. 55-57 at 2).

That same afternoon, Hollabaugh send an email to a contact at referral source Infinity Health Consulting, following a call that Hollabaugh had with a contact there. The email contained the subject line "Bristol Hospice Introduction," and stated:

> As I said this morning, I have opened Bristol Hospice; New Albany and we are greatly looking forward to caring for our community! . . . I will be the executive Director of Operations, and I would love to partner with The Waters of Scottsburg, The Waters of Clifty Falls, and the Waters of Georgetown as a contracted Hospice Agency providing the highest quality of hospice care. We would also like to be able to utilize The Waters for respite stays very soon. I will attach a couple of links with some information about our company. We offer several wonderful specialty programs that are very unique to our organization and our quality scores are unmatched. I am so looking forward to partnering with The Waters and caring for

our community together! Please let me know anything that you may need. I will attach a contract to this email as well!

(Filing No. 55-58 at 2). The next day, July 16, 2025, Hollabaugh sent a very similar email to a contact at Autumn Woods and stating, "I look forward to working with you in a new capacity." (Filing No. 55-59 at 2).

In late July, Hollabaugh contacted more referral sources about Bristol. On July 24, 2025, she texted two contacts at Sonida Living asking if she could "send some info to [their] email about [her] company," and saying she would "love to come and meet with [them] soon to tell [them] much more about it." (Filing No. 55-60 at 2). The same day, Hollabaugh texted a contact at Indian Creek that she "would love to be able to send [Indian Creek] respites and be a contracted hospice provider," and asking "who [she] could contact about a contract." (Filing No. 55-61 at 2).

On July 25, 2025, Hollabaugh was contacted by a case manager at Baptist Health Floyd, unrelated to Hollabaugh's earlier emails attempting to obtain a contract with Baptist Health (Filing No. 55-62). Hollabaugh informed the case manager that she had left SouthernCare and had opened a Bristol office in New Albany. *Id.* at 3–4. The case manager asked Hollabaugh to let Baptist Health know when Bristol was "up and running." *Id.* at 4. Hollabaugh said she "sure will," and referred the case manager back to SouthernCare.

Hollabaugh also attended an in-person meeting at Clark Rehab on July 28, 2025 (Filing No. 55-64 at 2). By this time, Hollabaugh had already submitted Bristol's state licensure application (Filing No. 57-11 at 160:19–161:2). Hollabaugh told her mother that the purpose of the meeting was to "talk [Clark Rehab] into using Bristol and get a contract." (Filing No. 55-64 at 2). Her mother asked, "[w]ill it be hard to get them from southern care?" *Id.* at 2. Hollabaugh answered, "[y]es it'll be hard to get them from SouthernCare but I can do it," *id.* at 3, meaning that

it would be difficult to convince Clark Rehab to work with an additional hospice provider given its existing relationship with SouthernCare (Filing No. 57-11 at 163:8–19).

Following her meeting at Clark Rehab, Hollabaugh texted Louisville VA Hospital case managers Logdson and Chaudron that she "[j]ust left Clark rehab and they said it won't be an issue. Lots of good feedback from facilities wanting to work with us! Our final license was submitted Friday. . . . Should be clarifying VA contract this week." (Filing No. 55-65 at 2). Hollabaugh also told the case managers that she "[w]ould love to introduce [Bristol's] president to [them] either this week or next . . . . and we could tell you a little bit about the company." Id. at 3.

Bristol obtained its Indiana license on August 5, 2025, and began accepting patients on September 5, 2025.

F.    **Procedural History and Subsequent Developments**

Gentiva sent Defendants a cease-and-desist letter on July 9, 2025 (Filing No. 7-5). Bristol responded on July 16, 2025, stating that it had "reminded Ms. Hollabaugh of the importance of her obligations and the importance of abiding by them." (Filing No. 26-9 at 8). A few days later, on August 5, 2025, SouthernCare initiated this lawsuit by filing its Verified Complaint and a motion for a temporary restraining order ("TRO") and preliminary injunction. Defendants appeared shortly thereafter and filed their response to SouthernCare's motion (Filing No. 25). The Court held a hearing on SouthernCare's request for a TRO on August 12, 2025 (Filing No. 28).

On August 20, 2025, the Court denied SouthernCare's request for a TRO and denied its request for a preliminary injunction without prejudice to refile (Filing No. 34 at 2). The Court concluded that SouthernCare had not clearly shown a likelihood of irreparable harm, relying in part on assertions by Defendants that no intentional contractual violations had occurred. These assertions included a July 17, 2025 assertion from Bristol's counsel that Hollabaugh contacted only a limited number of referrals sources to obtain contracts for Bristol's state licensure, that she had

"not been marketing for referrals," and that she had been instructed "not to reach out to her former colleagues and if they reach out to her to let them know she cannot speak to them in accordance with her non solicit." *Id.* at 10 (citing Filing No. 26-9 at 5). The Court also considered Hollabaugh's sworn statement that after her resignation, she forwarded patient referral inquiries back to SouthernCare (Filing No. 34 at 6). The Court further noted that at the time, SouthernCare had no evidence to cast doubt on the veracity of Hollabaugh's sworn statements, or to show that it had or would likely suffer harm to its goodwill. *Id.* at 11.

## III.    CONCLUSIONS OF LAW[2]

As previously stated, to obtain a preliminary injunction, SouthernCare must establish the following factors as to the statute it seeks to enjoin: (1) that it is likely to succeed on the merits of its claims; (2) that it has no adequate remedy at law; (3) that it is likely to suffer irreparable harm in the absence of preliminary relief; (4) that the balance of equities tip in its favor; and (5) issuing the injunction is in the public interest. *GEFT,* 922 F.3d at 364. The first two factors are threshold determinations. "If the moving party meets these threshold requirements, the district court 'must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied.'" *Stuller, Inc.*, 695 F.3d at 678 (quoting *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). The Court will address the threshold factors before addressing the remaining factors.

### A.    Likelihood of Success on the Merits

A party moving for preliminary injunctive relief need not demonstrate a likelihood of "absolute success on the merits." *Valencia v. City of Springfield*, 883 F.3rd 959, 966 (7th Cir. 2018). However, the plaintiff "must demonstrate that 'its claim has some likelihood of success on the

---

[2] Any conclusion of law should be deemed a finding of fact to the extent necessary.

merits,' not merely a 'better than negligible' chance." *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (quoting *Ty, Inc.*, 237 F.3d at 895). "What amounts to 'some' depends on the facts of the case at hand because of [the] sliding scale approach." *Id.* (citing *Ty, Inc.*, 237 F.3d at 895).

Additionally, to obtain a preliminary injunction, a plaintiff need only show it is likely to succeed on at least one if its claims, not all of them. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1096 (7th Cir. 2008) (citing *Ty, Inc.*, 237 F.3d at 897), *abrogated on other grounds by Nyken v. Holder*, 556 U.S. 418, 434 (2009). The Court will therefore not address all of SouthernCare's claims and will instead focus on SouthernCare's claims for breach of contract based on Hollabaugh's Customer Nonsolicitation, Employee Nonsolicitation, and Noncompetition Provisions.

### 1. Breach of the Customer Nonsolicitation Provision

Hollabaugh's Customer Nonsolicitation Provision prohibits her, for eighteen months after her resignation, from directly or indirectly contacting a "Covered Party," including her SouthernCare referral sources, "for the purpose of encouraging, causing, or inducing" the Covered Party to "cease (or reduce) its business" with SouthernCare, to "modify its relationship" with SouthernCare, "to divert hospice care or related opportunities" to Bristol, or to interfere with the Covered Party and SouthernCare's business relationship (Filing No. 55-15 at 6).

Defendants assert that Hollabaugh has not violated this restrictive covenant because her role of Executive Director does not entail any marketing duties, and that Hollabaugh is not responsible for, and receives no credit for, patient admissions (Filing No. 57-2). Benjamin Porter ("Porter"), Bristol New Albany's Hospice Liaison, handles those responsibilities (Filing No. 57-1 at 1). Defendants also note that Hollabaugh does not strategize with Porter about contacting referral sources or participate in Porter's visits to referral sources and patients. *Id.* These assertions appear

to be undisputed, but they are nonetheless immaterial because Hollabaugh's actions, and not her written job description, are what constitute violations of her Customer Nonsolicitation Provision.

Hollabaugh was not prohibited from merely informing her referral sources that she was leaving SouthernCare and joining Bristol, but she did much more than that. The evidence in the record clearly shows that Hollabaugh attempted to induce several referral sources to divert patients to Bristol, which inherently interferes with their existing relationship with SouthernCare. Within days of her resignation from SouthernCare, Hollabaugh told her referral sources that they would be "see[ing] each other more," that she would "still be coming" to them in her new role, that the referral sources would "not be disappointed," and that she was "[e]xcited to continue to work with" them (Filing No. 55-35; Filing No. 55-43; Filing No. 55-45; Filing No. 55-46). Later in July, Hollabaugh began more explicitly advertising Bristol's specific programs (Filing No. 55-53). It is clear that Hollabaugh expected her relationship with the Louisville VA Hospital case managers to result it patient diversions from SouthernCare to Bristol, telling de la Rosa that the Louisville VA Hospital is "a very big referral source to me and will likely provide anywhere from 5 to 10 admissions per month starting out." (Filing No. 55-54 at 2).

Hollabaugh marketed Bristol's services to other clients, including Baptist Floyd Health (Filing No. 55-63 at 8 ("I would love to be able to serve your patients . . . .")), and asked Baptist Floyd Health to add Bristol "to the Hospice options list" for discharged patients, allowing a patient to select Bristol from the list rather than SouthernCare, *id.* at 2. Hollabaugh also promoted Bristol to Autumn Woods and Infinity Health Consulting by sending unsolicited information about Bristol and its "wonderful specialty programs." (Filing No. 55-58; Filing No. 55-59).

Hollabaugh avers that she has "never held a business development role at Bristol" and does not "solicit patients who are currently receiving hospice care from other providers to switch to

Bristol hospice." (Filing No. 57-5 at 6–7). These statements are immaterial. The ample evidence offered by SouthernCare clearly shows that Hollabaugh went beyond her Executive Director duties and advertised Bristol to her SouthernCare referral sources (rather than patients) so that they would refer patients to Bristol.

Defendants argue that in these messages, Hollabaugh never disparaged SouthernCare and only promoted Bristol. This is a distinction without a difference; there are a finite number of hospice patients, and by referring patients to Bristol, a referral source is not referring that patient to SouthernCare. That is precisely the circumstance that Hollabaugh's Customer Nonsolicitation Provision is intended to prevent. Based on the current record, SouthernCare has a strong likelihood of success on the merits of its claim for breach of the Customer Nonsolicitation Provision.

### 2. **Breach of the Employee Nonsolicitation Provision**

SouthernCare has also shown a very strong likelihood of success on the merits of its claim for breach of Hollabaugh's Employee Nonsolicitation Provision. That provision prohibits Hollabaugh, for eighteen months after her resignation, from hiring or soliciting to hire any SouthernCare employee with whom she worked or soliciting any SouthernCare employee to leave her employment at SouthernCare. In its response brief, Defendants emphasize that Hollabaugh was not involved in the interview process for any SouthernCare employees, that Hollabaugh did not extend any job offers, and that no SouthernCare employees ever ultimately joined Bristol (Filing No. 57 at 27). But the Employee Nonsolicitation Provision is not so limited; it encompasses all solicitation of SouthernCare employees, whether formal or informal, and whether successful or unsuccessful.

Hollabaugh spoke with at least three SouthernCare employees about leaving SouthernCare. Hollabaugh asked Summer Russell twice—once before Hollabaugh's resignation and once after— if Russell would be interested in a new job not at SouthernCare (Filing No. 55-37; Filing No. 55-

36); *see Enhanced Network Solutions Grp., Inc. v. Hypersonic Technologies Corp.*, 951 N.E.2d 265, 268 (Ind. Ct. App. 2011) (defining "solicit" by looking to dictionary definition, "a request or petition . . .[t]he act or process of enticing or persuading another person to take a certain course of action"). Hollabaugh also had discussions with Brandy Trader about moving to Bristol, without regard to whether Trader was still employed by SouthernCare (Filing No. 55-35). Hollabaugh's messages with Russell and Trader show at least some likelihood of success on SouthernCare's claim for breach of the Employee Nonsolicitation Provision.

Hollabaugh's communications with Aly Rayner, though, are themselves sufficient to show a strong likelihood of success on the merits of SouthernCare's claim. Hollabaugh admits to speaking with Rayner about leaving SouthernCare to work for Bristol; Hollabaugh forwarded Rayner's contact information to Bristol's recruiter, Hawkins, and a group Bristol executive, touting Rayner's relationships with SouthernCare's referral sources. Although Hollabaugh claims that she did not discuss a specific role with Rayner (as contradicted by her messages to Hawkins), did not formally participate in Rayner's hiring process, and did not extend Rayner a job offer, Hollabaugh certainly solicited Rayner to leave SouthernCare and work for Bristol. SouthernCare has therefore shown a strong likelihood on the merits of its claim based on the breach of Hollabaugh's Employee Nonsolicitation Agreement.

### 3.  **Breach of the Noncompetition Provision**

SouthernCare also alleges that Hollabaugh has violated the Noncompetition Provision of her Employment Agreement, which provides that for six months after her resignation and within a seventy-five mile radius of SouthernCare's New Albany office, Hollabaugh may not "directly or through any third party acting in concert with Employee, own more than 5%, operate, be employed by or perform any work for hire that is the same or similar to the work" performed by Hollabaugh during her last two years with SouthernCare (Filing No. 55-15 at 5).

Defendants argue that this provision is overbroad and unenforceable for two reasons (Filing No. 57 at 20). First, Defendants argue that a provision prohibiting Hollabaugh from "own[ing] more than 5%, operat[ing], or be[ing] employed by . . . a Competitive Business" is unenforceable under Indiana law because it prevents Hollabaugh from working for a competitor in any capacity. *Id.*; *see MED-1 Solutions, LLC v. Taylor*, 247 N.E.3d 1269 (Ind. Ct. App. 2024) ("We have found covenants not to compete prohibiting an employee from working for a competitor in any capacity or from competing with portions of the business with which the employee was never associated to be unreasonable because they extend beyond the scope of the employer's legitimate interests.").

At oral argument, SouthernCare replied that a portion of the Noncompetition Provision is limited to the "same or similar work" that Hollabaugh performed for SouthernCare, and that this limited restriction is enforceable. To the extent the phrase "own more than 5%, operate, or be employed by" is overbroad under Indiana law, the Court may strike that language and leave the reasonably tailed prohibition on "perform[ing] any work for hire that is the same or similar to the work performed for [SouthernCare]." (Filing No. 55-15 at 5); *see Heraeus Med., LLC v. Zimmer, Inc.*, 135 N.E.3d 150, 153 (Ind. 2019) (reasserting that under Indiana's blue-pencil doctrine, courts may erase unreasonable language from restrictive covenants).

Second, Defendants argue that the seventy-five-mile restriction is unenforceable because it covers areas in which Hollabaugh did not work (Filing No. 57 at 21). Defendants assert that Hollabaugh's assigned territories with SouthernCare were Floyd, Clark, Harrison, and Scott counties, "with two referral sources just over the river in Louisville." *Id.* At oral argument, counsel for SouthernCare argued that the seventy-five-mile restriction reasonably protects SouthernCare's New Albany business because that radius encompasses the locations of patients who may travel to New Albany for hospice services. It is not unreasonable to assume that a patient may drive roughly

an hour for hospice care. During her deposition, Hollabaugh explained the importance of obtaining contracts with referral sources in other counties so patients who live, for example, sixty miles away can receive emergent care closer to their home (Filing No. 57-11 at 72:17–25). More importantly, evidence from SouthernCare shows that while working for SouthernCare, Hollabaugh was credited with admissions for patients who lived in Bloomington and Evansville, Indiana (Hearing Ex. 76 ¶ 29).[3] The Court concludes based on the record before it, that SouthernCare had a legitimate and protectable interest in the seventy-mile-restriction in the Noncompetition Provision, and the provision is therefore enforceable.

Having found that the Noncompetition Provision is enforceable, the Court turns to whether SouthernCare has a likelihood of showing breach. SouthernCare argues that Hollabaugh is performing the "same or similar work" she did at SouthernCare for Bristol by procuring contracts with referral sources and by marketing and promoting Bristol's services. The Court finds that SouthernCare can likely succeed on both of its theories of breach.

As to procurement of contracts, Defendants respond that Hollabaugh did not procure contracts for SouthernCare in the two years before her resignation, so her procurement work for Bristol is not the same or similar as her former work. However, SouthernCare cites deposition testimony confirming that Hollabaugh *did* work on and secure multiple contracts with referral sources in late 2023 and 2024 while working as a Hospice Care Consultant for SouthernCare (Filing No. 55-17 at 109:19–21, 110:18–111:22; Filing No. 55-18 at 2). Defendants do not, and

---

[3] At the December 9, 2025 hearing, the Court admitted SouthernCare's Exhibit 76 into evidence over Defendants' objection as to its timeliness. Defendants' objection is well taken; if SouthernCare wanted to offer evidence in reply to Defendants' response brief, SouthernCare should have sought leave to file a reply brief before the hearing. In the November 3, 2025 Scheduling Order, the Court clearly stated its "preference that the parties file declarations, deposition transcripts, or other written testimony and briefing, **before the hearing**," and that "the hearing shall consist of oral argument **summarizing the parties' positions**." (Filing No. 56 at 1 (emphases added)). In the interest of resolving SouthernCare's motions on the merits, the Court admitted SouthernCare's hearing exhibits over Defendants' objection, but SouthernCare is admonished to more carefully review the Court's orders, and to more closely adhere to the Court's procedures and preferences, going forward.

cannot, rebut SouthernCare's evidence; Hollabaugh does not "recall one way or the other" whether she worked on or secured contracts for SouthernCare and has no reason to dispute SouthernCare's records showing that she did (Filing No. 57-11 at 161:12–162:4).

Defendants also argue that Hollabaugh did not breach her Noncompetition Provision because she is employed in "a clinical and operational role, not a sales role," and she "does not oversee" Bristol's business development (Filing No. 57 at 26–27). However, as explained above, the evidence shows that Hollabaugh is engaging in business development work, whether or not that work is in her job description. Hollabaugh has marketed Bristol's services and programs to numerous referral sources with whom she developed relationships while working at SouthernCare. Hollabaugh has been performing the same or similar marketing, promotion, and business development work that she performed for SouthernCare. SouthernCare has therefore shown a strong likelihood of success on its claim for breach of the Noncompetition Provision.

**B.    Irreparable Harm With No Adequate Remedy at Law**

SouthernCare argues that without preliminary injunctive relief, it will suffer irreparable harm for which there is no adequate remedy at law. Specifically, SouthernCare contends that it stands to suffer damage to its reputation and goodwill in an already competitive hospice market and resulting loss of hospice patient referrals (Filing No. 55-1 at 28). "[I]t is well established that the loss of goodwill and reputation, if proven, can constitute irreparable harm." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021); *see J.P. Morgan Securities LLC v. Weiss*, No. 19-cv-4163, 2019 WL 6050176, at *8–9 (S.D. Ind. Nov. 15, 2019).

At the start of this case, SouthernCare could show only a possibility of harm to its goodwill. But now, SouthernCare offers ample evidence that harm to its goodwill is not only possible but likely. Hollabaugh instructed her sister-in-law to tell a nursing professional "definitely not to work for Gentiva or SouthernCare" because "things are going downhill there." (Filing No. 55-9 at 2).

And while informing a referral source about her move to Bristol, Hollabaugh noted the referral source's "poor prior experiences" with SouthernCare (Filing No. 55-45 at 2–3).

SouthernCare has also offered evidence that some patient admissions *have* been diverted away from SouthernCare. On July 8, 2025, before her first day with Bristol, Hollabaugh forwarded a patient referral inquiry to St. Croix Hospice, another SouthernCare competitor, despite her sworn testimony implying that she had forwarded all referrals to SouthernCare after her resignation and before Bristol could accept patients (Filing No. 55-47 at 2–3; Filing No. 26-1 at 11).

There is also evidence the Cornerstone has begun diverting patient referrals to Bristol. Evan Gold, Cornerstone's Operating Director and Hollabaugh's confidant, has referred five to six patients to Bristol since Bristol began accepting patients (Filing No. 57-1 at 2). In an August 10, 2025 affidavit, Gold represented that he "plan[ned] to continue to refer hospice patients to SouthernCare" after Hollabaugh's resignation. Despite Gold's implicit assertion that Cornerstone would not alter its business relationship with SouthernCare following Hollabaugh's resignation, Gold has referred only one patient to SouthernCare since that time, and that one patient was not eligible for hospice services (Filing No. 57-3 at 2; Hearing Ex. 76 at 5). Gold asserts that Hollabaugh "has not solicited [him] for hospice referrals to Bristol, and none of the patients that [he has] referred to Bristol were due to any solicitation by Ms. Hollabaugh." (Filing No. 57-3 at 2). But again, the lack of formal solicitation by Hollabaugh is not dispositive. In light of the evidence of Gold and Hollabaugh's preexisting professional relationship, the fact that Cornerstone has begun referring patients to Bristol and not referred a single eligible patient to SouthernCare since Hollabaugh's departure shows that SouthernCare is suffering irreparable harm to its business relationships in the New Albany/Louisville area.

The Court finds that SouthernCare has shown it is likely to suffer irreparable harm without an adequate remedy at law if no injunction is issued. This harm and inadequate remedy include the potential loss of goodwill, loss of patient referrals, and even a potential loss of experienced employees because of a former employee's disparaging remarks and improper (informal) solicitations. While SouthernCare may be able to calculate some monetary damages based on patients that have been referred to Bristol, that is only part of the harm and part of the remedy.

## C.    **Balance of Harms and Public Interest**

The final two questions are whether the balance of harms and public interest weigh in favor of preliminary relief. These factors may be viewed together. The Court "weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell*, 796 F.3d at 662. As discussed above, SouthernCare has a strong likelihood of success on its claims, so the balance of harms need weigh only slightly in its favor to warrant injunctive relief.

An injunction would safeguard SouthernCare's goodwill, reputation, and existing business relationships and, by contrast, would only prohibit Hollabaugh from engaging in conduct that violates her contractual obligations to SouthernCare. Evidence offered by SouthernCare shows that absent a court order, Hollabaugh is likely to continue engaging in the same types of violative behavior during this litigation. On July 10, 2025, after receiving SouthernCare's pre-suit demand letter, Hollabaugh told her grandmother that "it is comical to [her]," she is "not concerned," and SouthernCare is "very stupid." (Filing No. 55-49 at 10). And on July 29, 2025, upon learning that SouthernCare was going to file suit, Hollabaugh texted her sister-in-law that Bristol's "President and legal team don't give a sh[*]t," and the President "said go harder." (Filing No. 55-11 at 6–7). Hollabaugh also stated in her deposition that solicitation of her SouthernCare referral sources

would be a violation of her Employment Agreement but believes that her conduct to date has not constituted solicitation or promotion of Bristol (Filing No. 57-11 at 97:5–9, 126:4–17). Hollabaugh also repeatedly asserted that she does not understand her Employment Agreement or what her restrictive covenants require. *Id.* at 23:23–24:18, 25:12–16. All these assertions, taken together, indicate that Hollabaugh, through ignorance or otherwise, will likely continue engaging in conduct that violates her Employment Agreement absent preliminary injunctive relief.

Defendants argue that SouthernCare's requested injunction is "so broad and ill-defined that it could only act as a bar to Hollabaugh's employment at Bristol," which would cause Hollabaugh and her family severe harm. (Filing No. 57 at 32); *see Weiss*, 2019 WL 6050176, at *9 (acknowledging defendant's argument that with an injunction, defendant would "not be able to answer fully and truthfully because he will have the possible threat of contempt of a court order if his responses are in some way considered solicitations," and that "[t]here is a strong public interest in open competition in the securities market"). In this case, Bristol has already hired a marketing director—Benjamin Porter—who can manage all correspondence with referral sources, and now that Bristol has obtained its necessary state license, its marketing team can handle all correspondence with potential new hires, including new hires that might currently be working for SouthernCare. There is no allegation that SouthernCare has or would interfere with any referral source sending patients to Bristol, any patient who may choose Bristol for hospice services, or any employee who moves to Bristol (assuming there is no violation of the employee's agreements with SouthernCare).

The Court finds that the public interest does not favor one party over another, but the balance of harms favors SouthernCare. Without an injunction, SouthernCare's goodwill and its business relationships will be threatened. The harm to Defendants, by contrast, will be minimal

because the job for which Hollabaugh was hired admittedly entails no solicitation or marketing duties, especially now that Bristol is already licensed and operating. An injunction would simply order Defendants to honor Hollabaugh's contractual obligations to SouthernCare while still allowing her to perform her Executive Director duties.

### D.    <u>Duration of the Preliminary Injunction</u>

SouthernCare requests preliminary injunctive relief "for the maximum period allowed by law" without specifying what "law" the Court should apply or identifying a specific length of time. At the December 9, 2025 hearing, counsel for Defendants argued that SouthernCare has not asserted that it is entitled to tolling of the noncompetition and nonsolicitation periods set out in the Employment Agreement, and the Court agrees. The Court will therefore limit the provisions of the preliminary injunction to the applicable periods set out in the Employment Agreement. If no specific duration is given for a portion of the preliminary injunction, then that provision shall apply until the conclusion of this case or until the Court orders otherwise.

## IV.    <u>CONCLUSION</u>

For the reasons explained above, SouthernCare's Renewed Motion for Preliminary Injunction (Filing No. 55) is **GRANTED**. Pursuant to Federal Rule of Civil Procedure 65(d), the Court issues a preliminary injunction as follows:

(a)    For the six-month period following Hollabaugh's last day at SouthernCare (June 30, 2025), Hollabaugh and Bristol shall refrain from continuing Hollabaugh's employment with Bristol in any role involving the marketing or promotion of hospice services within a 75-mile radius of SouthernCare's New Albany office, 811 Northgate Boulevard #101, New Albany, Indiana 47150;

(b)    For the eighteen-month period following Hollabaugh's last day at SouthernCare (June 30, 2025), Hollabaugh shall refrain from soliciting, directly or indirectly through other Bristol employees, contractors, or agents, any patient referrals from any referral source from whom/which Hollabaugh solicited patient referrals while employed by SouthernCare, including hospitals, physicians, nurse practitioners, skilled nursing

facilities, assisted living facilities, as well as former patients and/or their family members;

(c)     For the eighteen-month period following Hollabaugh's last day at SouthernCare (June 30, 2025), Hollabaugh shall refrain from soliciting, directly or indirectly, through other Bristol employees, contractors, or agents, any employee of SouthernCare with whom she worked, to join Bristol or discontinue their employment with SouthernCare;

(d)     Hollabaugh and Bristol are prohibited from using or disclosing all nonpublic information obtained as a result of or during Hollabaugh's employment with SouthernCare concerning SouthernCare's employees, patients, leads, referral sources, business development/marketing processes or strategies, compensation, or personnel to Bristol or any other person or entity;

(e)     Hollabaugh and Bristol are prohibited from destroying, removing or secreting documents, records, electronically or magnetically stored information (including but not limited to texts, emails, voicemails, and social media messages, including but not limited to SnapChat), or storage devices; and

(f)     For the eighteen-month period following Hollabaugh's last day at SouthernCare (June 30, 2025), Hollabaugh is prohibited from, directly or indirectly through Bristol or others, diverting patients referred to SouthernCare to any other hospice care provider.

Defendants do not contend that they will incur monetary damages from this injunction, so

SouthernCare need not post a bond.

**SO ORDERED**.

Date:   12/22/2025

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Theresa A. Canaday
FROST BROWN TODD LLC
tcanaday@fbtlaw.com

Amanda C. Couture
Frost Brown Todd
acouture@fbtlaw.com

Nicholas R. Franco, III
Goodwin Procter LLP
nfranco@goodwinlaw.com

Meredith Grant
Frost Brown Todd LLP
mgrant@fbtlaw.com

Timothy Holahan
Goodwin Procter LLP
tholahan@goodwinlaw.com

Jeffrey S. Moad
STITES & HARBISON, PLLC (Louisville)
jmoad@stites.com

Ian T. Ramsey
STITES & HARBISON PLLC
iramsey@stites.com

Joseph Rockers
Goodwin Procter LLP
jrockers@goodwinlaw.com

Scott A. Wandstrat
scott.wandstrat@gentivahs.com

Kathleen Biggs Wright
FROST BROWN TODD
kwright@fbtlaw.com